IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF WEST VIRGINIA, by and through the WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION,<br><br>    Plaintiffs,<br><br>    v.<br><br>JAMES C. JUSTICE COMPANIES, INC., JAMES C. JUSTICE, II, and HIGH MOUNTAIN LIVING, LLC,<br><br>    Defendants. | Civil Action No. 1:15-cv-16018 |

## DECLARATION OF KATELYN ALMETER

Pursuant to 28 U.S.C. § 1746, I, Katelyn Almeter, declare as follows:

1. I am a Life Scientist and senior inspector in the Enforcement & Compliance Assurance Division ("ECAD"), U.S. Environmental Protection Agency, Region III ("EPA"). I have worked for EPA since May 2015, and have worked in a Clean Water Act program for the entirety of my employment at EPA. Within ECAD, I have held my current role for approximately 3 years, which is from the time that ECAD was created as a standalone division at EPA, Region III. Among my responsibilities in my current role at EPA, I conduct site inspections under Sections 308 and 404 of the Clean Water Act, identify and assess aquatic resources, conduct delineations to document the presence of wetland soils, wetland vegetation, and hydrology, develop and gather evidence to support enforcement matters, provide technical

support in Clean Water Act enforcement actions, and assist in the drafting and preparation of various enforcement documents in support of EPA's mission.

2. I hold a Bachelor of Arts degree in Environmental Science from Franklin & Marshall College. I have taken courses and training in stream and wetland identification, delineation, and assessments, and have been a fully-trained and credentialed Clean Water Act Section 404 inspector for 5 years.

3. I submit this Declaration in support of the United States' Motion to Enforce the Consent Decree in the matter of *United States of America, et al. v. James C. Justice Companies, Inc., et al.*, Civil Action No. 1:15-cv-16018 (S.D. W. Va.), entered on February 25, 2016 ("Consent Decree").

4. The Consent Decree requires Defendants James C. Justice Companies, Inc., and James C. Justice, II (the "Justice Defendants"), to, among other things: remove twenty dams constructed along an approximately 1.5 miles stretch of Turkey Creek and one of its tributaries on property near McGlone, Monroe County, West Virginia ("Site"), restore the affected stream channels and floodplains to their approximate pre-disturbance conditions, monitor the success of that restoration work, and record deed restrictions to protect the restored areas. Since 2018, I have served as EPA's lead scientist responsible for monitoring the Justice Defendants' compliance with those obligations.

5. Consent Decree Paragraphs 23–30 outline at a high level the Justice Defendants' stream restoration-related obligations. EPA's March 12, 2018 "Approval [of Restoration Plans] With Specified Conditions" includes additional details on that topic. I was one of the primary authors of that document, a true and correct copy of which is attached hereto as Exhibit 1 (including EPA's transmittal letter). The document includes concept-level conditions intended to

guide the Justice Defendants' performance of the dam removal work, stream restoration, and long-term post-restoration monitoring. However, EPA also made clear that further details – including a post-restoration monitoring plan – were to be fleshed out by the Justice Defendants in future submittals to EPA. EPA's transmittal letter stated that the specified conditions "represent[] the conceptual elements of a restoration plan," and that "[f]inal design decisions, including detailed plans and specifications . . . must be developed by the Defendants consistent with the conceptual elements outlines in [this approval]." *Id.* at 1.

6. EPA's approval with conditions successfully prompted the Justice Defendants to perform the long-delayed dam removal and stream restoration work, which was completed by August 2018. However, EPA has not received any plans or reports from the Justice Defendants regarding post-restoration monitoring. The deliverables to EPA are now significantly overdue. For example, by May 1, 2019, the Justice Defendants' were required to have "evaluate[d] Turkey Creek and report[ed] to EPA . . . whether additional restoration measures are needed and, if so, provide a post removal restoration plan." Ex. 1 at 7. In addition, beginning April 2019, the Justice Defendants were to have "implement[ed] a monitoring plan" that includes periodic sampling, photographs, and other information. *Id.* EPA has not received from the Justice Defendants any assessments of whether additional restoration work is required, any plans for conducting post-restoration monitoring, or any reports whatsoever regarding the condition of the streams following the August 2018 completion of the dam removal and stream restoration work. By now, the Justice Defendants should have submitted to EPA at least six monitoring reports.

7. Since the dam removal work began in 2018, I have visited the Site three times: twice in 2018, and once in 2019. On July 31, 2018, I walked the Site to observe the status of the dam removal work. I was accompanied by Mr. John Sams, a representative of the Justice

Defendants who indicated he was the primary person in charge of removing the dams. I observed that 18 of the 20 dams had been removed from the Turkey Creek stream channel. I noted some areas of erosion along the stream banks where the dams had been removed, and there was sparse germination of the native seed mix applied to aid stream bank stabilization. On August 13, 2018, EPA's follow-up letter to Mr. Sams requested photographic documentation to confirm proper removal of the remaining two dams, and explained in that letter that any broken-up pieces of the dams left on-Site should be removed from the floodplain, and be no closer than 10 feet from the stream banks. Ex. 2. EPA's letter also included a reminder that the Justice Defendants were required to provide a detailed monitoring plan for the Site.

8. I visited the Site again on August 28, 2018. I confirmed that all 20 dams had been removed from the stream channel. EPA's follow-up letter to Mr. Sams, dated October 18, 2018, included another reminder of the requirement to submit a post-restoration monitoring plan. Ex. 3. EPA also documented in that letter the parties' agreement during the August 28 visit to reevaluate in Spring 2019 "the status of the stream bank erosion areas, located at points of dam failures, and stream flow alteration . . . to determine if corrective measures are necessary or the stream has self-stabilized."

9. On July 24, 2019, approximately one year after removal of the dams, I visited the Site to observe and document the condition of the streams. The eroded areas of the stream banks that I had observed during my previous visit had improved, and generally the dam removal and restoration work appeared to have been performed. On September 12, 2019, I sent a letter, via the United States Postal Service and email, to Mr. John Sams (cc Michael Callaghan, Esq.) transmitting EPA's *Field Assessment Summary* and Rapid Habitat Assessment data. Ex. 4. My letter included a reminder of the Justice Defendants' overdue obligations to provide a detailed

post-restoration monitoring plan and to record deed restrictions.  By that point, the Justice Defendants' post-restoration monitoring plan was already several months overdue, and they should have also submitted to EPA two written monitoring reports.  I did not receive a response to my September 12, 2019 letter.

10. On March 25, 2020, I sent another letter to Mr. Sams, noting that EPA still had not received a monitoring plan from the Justice Defendants.  Ex. 5.  The letter was sent only electronically, as the EPA office was recently closed due to COVID-19.  I was hopeful that my letter would prompt action before the passing of another spring season (which is the time of year during which post-restoration monitoring should be conducted).  Unfortunately, I did not receive a response to this letter either.

11. On May 6, 2020, I sent Mr. Sams a follow-up email inquiring about the lack of response to my March 25, 2020, letter and the status of the spring monitoring event.  Ex. 6.  Mr. Sams responded to my email that day stating: "I will get this to you by the end of the week."  *Id.*  I did not receive any further communication from Mr. Sams nor did I receive the monitoring report.  I sent an additional follow-up email to Mr. Sams on June 2, 2020 to which I received no response.  Ex. 7.

12. On December 8, 2020, Mr. Harry D. McKenzie, on behalf of the Justice Defendants, contacted the public information center at EPA requesting information on the appropriate EPA staff to get information on the required monitoring activities for the Turkey Creek Site.  Ex. 8.  Mr. McKenzie was provided the contact information for myself and Stefania Shamet of EPA's Office of Regional Counsel as the EPA Region III points of contact for the Turkey Creek Site.  *Id.*  I spoke with Mr. McKenzie over the phone on December 9, 2020.  He said that he had been hired to take care of the remaining requirements for the Consent Decree.

5

We discussed what those requirements were and he requested any information I could provide him on those requirements. Later that day, I emailed Mr. McKenzie the March 12, 2018 letter, the September 12, 2019 letter, and the March 25, 2020 letter. Ex. 9.

13. Following receipt of the Site information, Mr. McKenzie indicated that he was not qualified to conduct all of the outstanding monitoring elements, specifically the in-stream assessment and sampling. However, he told me that he would work to retain a qualified entity to conduct the work. Mr. McKenzie identified Navigator Environmental & Technical Services, Inc. On December 18, 2020, Mr. McKenzie set up a conference call with me and Mr. David Willson and Mr. Thomas Cook of Navigator Environmental & Technical Services, Inc., to discuss the monitoring requirements. Ex. 10. Following that call, I was hopeful that monitoring would begin at the Site. However, I did not receive any additional communications. Therefore, on February 4, 2021, I contacted Navigator Environmental & Technical Services, Inc., via email to check on the status of the Site monitoring requirements. Ex. 9. Mr. Willson's response indicated that there had been no contract for the work yet, so monitoring activities had not begun. *Id.*

14. On April 15, 2021, Karen Melvin, EPA Region III's Director of the Enforcement & Compliance Assurance Division, sent a letter to counsel for the Justice Defendants regarding the overdue monitoring plan and other Consent Decree compliance issues. EPA's letter noted that "[t]he purpose of monitoring is to determine whether the restoration . . . has achieved the performance criteria set forth in [EPA's March 2018] specified conditions." Ex. 11. EPA has no record of any response to that letter.

15. To summarize: EPA has not received from the Justice Defendants an evaluation of whether additional restoration measures are needed, or a plan detailing how they propose to conduct post-restoration monitoring. Nor has EPA received any post-restoration monitoring

reports.  By now, the Justice Defendants have failed to submit a total of six written reports, based on sampling and other monitoring work that should have been conducted each April and early July of 2019, 2020, and 2021.  As such, the Justice Defendants have entirely failed to satisfy their Consent Decree obligations to plan for, conduct, and report twice-yearly to EPA regarding post-restoration monitoring at the Site.

16. In addition to the post-restoration monitoring issues, I am also aware that the Justice Defendants are required by Paragraph 29 of the Consent Decree to record deed restrictions to protect the restored portions of the Site.  I am familiar with six letters, sent by myself, my EPA management, and by the U.S. Department of Justice, that included specific reminders about that obligation.  Four of those letters are cited above (Exs. 1, 3, 4, and 11).  True and correct copies of the additional two letters, sent on February 10, 2017 and December 11, 2017, are attached hereto as Exhibits 12 and 13, respectively.  I am not aware of any written responses to any of those communications that resolves or addresses the outstanding deed restriction requirement.  This is even after EPA agreed in its March 12, 2018 letter to consider (subject to any local, state, and federal permitting issues) a deed restriction that would allow for fish habitat enhancement structures.  Ex. 1 at 3. To the best of my knowledge, the Justice Defendants have not recorded any deed restrictions to protect the restored portions of the Site.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 7 , 2021.

By:

_____
Katelyn Almeter
Life Scientist
Enforcement & Compliance Assurance Division
U.S. Environmental Protection Agency
Region III