# Exhibit 1

Declaration of Katelyn Almeter

**VIA E-MAIL AND U.S. MAIL FIRST-CLASS**

Michael Callaghan
Law Offices of Neely & Callaghan
159 Summers Street
Charleston, West Virginia 25301
304-343-6500
mcallaghan@neelycallaghan.com

MAR 1 2 2018

Re:  Approval with Specified Conditions, *United States of America, et al. v. James C. Justice Companies, et al.*, Civil Action No. 1:15-cv-16018 (S.D. W. Va.)

Dear Mr. Callaghan:

Pursuant to Paragraph 23 of the Consent Decree in the above-referenced matter, the Defendants James C. Justice Companies, Inc. and James C. Justice, II (Defendants) submitted to the U.S. Environmental Protection Agency Region III (EPA) in April 2016 a document authored by Potesta & Associates, Inc. titled "Dam Structure Characterization and Removal Dams 11-20" and appendices (2016 Plan). The 2016 Plan incorporates by reference a document also authored by Potesta & Associates, Inc. and submitted in September 2014 titled "Report Detailing Removal of Twenty Impounding Structures on Turkey Creek Monroe County, West Virginia" (2014 Plan).

On October 11, 2016, EPA provided comments on the 2016 Plan. Following a site visit in February 2017, EPA provided further comments by letter dated July 24, 2017. Based upon discussion among the parties and pursuant to Paragraph 24 of the Consent Decree, EPA hereby approves upon specified conditions the 2014 and 2016 Plans. The specified conditions are set forth in the attachment to this letter. Please note that the timeline accompanying submission of the 2014 Plan has passed and is not within the scope of this approval. Rather, new timelines are among the specified conditions in the attachment.

As set forth in greater detail in the attachment and stated in the December 11, 2017, letter from Austin Saylor, USDOJ, to Michael Callaghan, this approval with specified conditions represents the conceptual elements of a restoration plan. Final design decisions, including detailed plans and specifications to the extent necessary and appropriate, must be developed by Defendants consistent with the conceptual elements outlined in the attachment. This approval with specified conditions incorporates the statement at pages 4-5 of the 2016 Plan that these plans "are conceptual in nature as final design decision will be made in the field using a modified design build approach. This is necessary as conditions found in this report may not be consistent with those present at the time of construction and onsite modifications may be necessary."

It is EPA's understanding that the Justice Defendants may wish to place structures in the waters to enhance fishing conditions. Any such activities presumably would entail discharges of dredged or fill material to the waters. Such discharges could not be authorized through the Consent Decree process and would require prior authorization from the U.S. Army Corps of Engineers pursuant to Section 404 the Clean Water Act, 33 U.S.C. § 1344 and any applicable state and/or local permits. In addition, the Justice Defendants have not yet satisfied the deed restriction requirements in Paragraph 29 of the Consent Decree. The sample deed restriction included as Appendix B to the Consent Decree would prohibit any such activities. However, if the Justice Defendants were to submit to EPA a revised form of deed restriction that expressly allows for appropriate fishing enhancement activities, EPA would be willing to consider whether such a deed restriction would be "substantially similar" to the form of deed restriction attached as Appendix B to the Consent Decree within the meaning of Paragraph 29. Separate authorization from the Corps, as noted above, would still be required. Subject to the foregoing, nothing in the Consent Decree would preclude the Justice Defendants from seeking such separate authorization from the Corps.

The specified conditions set forth in the attachment are applicable solely to the site-specific impacts that are the subject of the above-reference matter and should not be viewed as an endorsement of any restoration methodology or sequence outside of the context of this matter.

Thank you for your cooperation. If you have technical questions regarding this approval with specified conditions, please contact Todd Lutte at (215) 814-2099. If you have other questions, please feel free to contact the attorney assigned to this matter, Stefania D. Shamet, at (215) 814-2682.

Sincerely,

John R. Pomponio, Director
Environmental Assessment and Innovation
Division

Enclosure

cc: Austin Saylor, USDOJ
Susan Porter, USACE
Jeremy Bandy, WVDEP

ATTACHMENT

**APPROVAL WITH SPECIFIED CONDITIONS**
*United States of America, et al. v. James C. Justice Companies, et al.,*
Civil Action No. 1:15-cv-16018 (S.D. W. Va.)

Pursuant to Paragraph 23 of the Consent Decree in the above-referenced matter, the Defendants James C. Justice Companies, Inc. and James C. Justice, II (Defendants) submitted to the U.S. Environmental Protection Agency Region III (EPA) in April 2016 a document authored by Potesta & Associates, Inc. titled "Dam Structure Characterization and Removal Dams 11-20" and appendices (2016 Plan). The 2016 Plan incorporates by reference a document also authored by Potesta & Associates, Inc. and submitted in September 2014 titled "Report Detailing Removal of Twenty Impounding Structures on Turkey Creek Monroe County, West Virginia" (2014 Plan).

On October 11, 2016, EPA provided comments on the 2016 Plan. Following a site visit in February 2017, EPA provided further comments by letter dated July 24, 2017. Based upon discussion among the parties and pursuant to Paragraph 24 of the Consent Decree, EPA approves upon specified conditions as set forth below the 2014 and 2016 Plans. This approval upon specified conditions represents the conceptual elements of a restoration plan. Final design decisions, including detailed plans and specifications to the extent necessary and appropriate, must be developed by Defendants consistent with the conceptual elements outlined below and submitted to EPA for review and approval no later than May 1, 2018. This approval upon specified conditions incorporates the statement at pages 4-5 of the 2016 Plan that these plans "are conceptual in nature as final design decision will be made in the field using a modified design build approach. This is necessary as conditions found in this report may not be consistent with those present at the time of construction and onsite modifications may be necessary." The specified conditions set forth herein are applicable solely to the site-specific impacts that are the subject of the above-reference matter and should not be viewed as an endorsement of any restoration methodology or sequence outside of the context of this matter.

Paragraph 23 of the Consent Decree specifies that the Restoration Plan must:

(a) be designed to restore the Sites to approximate pre-disturbance original conditions consistent with the definition of restoration found in 40 C.F.R. § 230.92;
(b) include a schedule for implementation;
(c) include compensation for impacts to streams and wetlands using the West Virginia Stream and Wetland Valuation Metric ("WVSWVM") to determine the appropriate amount of mitigation needed to offset permanent and temporal losses to aquatic resources;
(d) ensure that restored areas are stabilized so as to maintain channel and floodplain configuration and to avoid excessive erosion and sedimentation, landslides or slips;
(e) utilize only native West Virginia species for planting;

1

(f) incorporate quantitative performance measures;
(g) establish a calculation of surplus credits, if any; and
(h) include a post-restoration monitoring plan for a period of ten years.

With the exception of the timeline accompanying the 2014 Plan, the 2016 Plan with appendices and the 2014 Plan are incorporated herein by reference, except as noted below. As set forth in the Consent Decree (Paragraphs 9-10), all activities must comply with the terms and conditions of Corps of Engineers Nationwide Permit 32 (including, but not limited to General Conditions 18 and 20), West Virginia's Standard Conditions for CWA 401 Certification of Nationwide Permit 32, West Virginia's General National Pollutant Discharge Elimination System/Water Pollution Control Permit No. WV0115924 and the terms and conditions of the Consent Decree. In addition, a right of entry from the West Virginia Public Lands Corporation must be obtained. Nothing in this approval relieves Defendants from their obligation to obtain any other necessary federal, state or local permits.

## Removal of Dam Structures

All dam structures, including all associated appurtenances and fill should be removed from the stream completely. Removal should occur such that release of any sediment built up behind the dam occurs in a controlled manner. Upon completion of removal, as-built diagrams shall be provided to EPA.

### *Sequence and Schedule*

Removal of the dam structures should commence at the most downstream structure (Dam 20) and proceed upstream one structure at a time. All dam structures should be removed during the period July 15 – September 15, 2018 during times when precipitation levels during the preceding 30 days is equal to or less than average precipitation during that time period as measured by precipitation data at Union, West Virginia. No work should be conducted within 48 hours after any precipitation event. Consistent with the monitoring plan set forth below, upon removal of the dam structures, it would be acceptable to allow the stream to stabilize over the winter without further work. The stream should be assessed in the spring to determine whether additional restoration is necessary.

### *Dams 20-11*

The description in the 2016 Plan (including where appropriate the descriptions of the process set forth in the 2014 Plan) of removal of these structures is incorporated by reference with inclusion of the following specified condition:

- Access to each location should be limited to access used to create the structure. Presence of equipment in the stream should be limited to that which is necessary for removal. Equipment should not traverse upstream or downstream.
- Each location should be evaluated for the presence of adjacent wetlands. Where wetlands are present, impacts to those wetlands should be avoided to the maximum

2

extent practicable. Where impacts to adjacent wetlands are unavoidable, impacts to wetlands should be documented and included in the mitigation plan (see below).

- Unless inconsistent with bank failure, the need to avoid pressure on either bank, or other site-specific conditions, removal should occur in stages, removing 6-12 inches of dam height at a time if possible in order to limit the rate at which water impounded above the structure is released.
- Rock, concrete, and/or other material comprising the structure that is removed should be placed outside floodplain area initially and removed and disposed of in an appropriate upland disposal site.
- The stream bank areas where the dam abutted should be immediately stabilized. At a minimum, this should include smoothing and grading to a slope no greater than 2:1, seeding with a quick-growing seed mixture (the seed mixture set forth in the 2014 Plan is acceptable) and installing erosion control matting. Use of hay or straw is not acceptable.
- To the extent installation of some type of structure is necessary to stabilize the bank areas where the dam abutted, natural stream design should be used as per Harman, W., R. Starr. 2011. Natural Channel Design Review Checklist. U.S. Fish and Wildlife Service, Chesapeake Bay Field Office, Annapolis, MD and U.S. Environmental Protection Agency, Office of Wetlands, Oceans, and Watersheds, Wetlands Division. Washington, D.C. EPA 843-B-12-005. Use of concrete from the dam structure is not acceptable.
- Impacts to aquatic resources and floodplain associated with equipment access should be smoothed, seeded and mulched. Use of hay or straw is not acceptable.

*Dams 10-1*

- Each structure should be evaluated prior to removal consistent with the type of evaluation conducted for Dams 11-20 in the 2016 Plan. Such evaluation should include analysis of the best way to remove the structure while avoiding or minimizing additional impacts. For example, where there has been bank failure at either abutment location, the removal should be conducted so as to avoid releasing waters that would be directed towards the failing bank.
- Access to each location should be limited to access used to create the structure. Presence of equipment in the stream should be limited to that which is necessary for removal. Equipment should not traverse upstream or downstream.
- Each location should be evaluated for the presence of adjacent wetlands. Where wetlands are present, impacts to those wetlands should be avoided to the maximum extent practicable. Where impacts to adjacent wetlands are unavoidable, impacts to wetlands should be documented and included in the mitigation plan (see below).
- Unless inconsistent with bank failure, the need to avoid pressure on either bank, or other site-specific conditions, removal should occur in stages, removing 6-12 inches of dam height at a time in order to limit the rate at which water impounded above the structure is released.
- Rock, concrete, and/or other material comprising the structure that is removed should be placed outside floodplain area initially and removed and disposed of in an appropriate upland disposal area.

- The stream bank areas where the dam abutted should be immediately stabilized. At a minimum, this should include smoothing and grading to a slope no greater than 2:1, seeding with a quick-growing seed mixture (the seed mixture set forth in the 2014 Plan is acceptable) and installing erosion control matting. Use of hay or straw is not acceptable.
- To the extent installation of some type of structure is necessary to stabilize the bank areas where the dam abutted, natural stream design should be used as per Harman and Starr (2011). Use of concrete from the dam structure is not acceptable.
- Impacts to aquatic resources and floodplain associated with equipment access should be smoothed, seeded and mulched. Use of hay or straw is not acceptable.

**Post-removal monitoring, restoration, and quantitative performance metrics**

- No later than May 1, 2019, Defendants shall evaluate Turkey Creek and report to EPA pursuant to Paragraph 23 of the Consent Decree whether additional restoration measures are needed and, if so, provide a post-removal restoration plan. Pursuant to Paragraph 24, EPA will respond to this submission. Such evaluation should include the following:
  - Whether the stream bank areas abutting each dam structure have been stabilized so as to avoid erosion beyond what would be expected under natural conditions
  - Whether the stream channel upstream and downstream of each dam structure location has reached equilibrium consistent with pre-construction channel, water surface, substrate, and bankfull height. Regional curves may be used to verify channel geometry.
  - Whether the stream channel upstream and downstream of each dam structure location has connected to the floodplain consistent with what would be expected under natural conditions.
  - A visual inspection of impacted stream reaches for issues with stability, bank erosion, failure of vegetative cover, or formation of depositional bars due to remaining flow alterations from dam removal.
  - Whether the floodplain has stabilized.
- Commencing April 2019, Defendants shall implement a monitoring plan consisting of:
  - Use of five (5) sampling locations at riffles–
    - Closest riffle downstream of all the dams
    - One riffle within the area of the first 10 dams
    - One riffle between dams 20-11 and dams 10-1
    - One riffle within the area of the upstream 10 dams
    - The closest riffle in Turkey Creek upstream of all of the dams
  - Monitoring to be conducted each in April and Early July – one for the Spring Index Period and one for the Summer, commencing the Spring prior to dam removal and for 3 years. If no significant degradation is found, sampling will continue yearly for the Spring Index Period and at the farthest downstream point. If degradation occurs, the 5 sites x 2 times per year schedule will continue.
  - Monitoring reports submitted to EPA within 60 days of each sampling event.
  - At each sampling point, the following should be conducted:
    - Collection of macroinvertebrate kicknet sample to be preserved and analyzed consistent with the Genus-Level Index of Most Probable Stream Status (GLIMPSS). *See* Pond GJ, Bailey JE, Lowman BM, Whitman MJ.

4

2012. Calibration and validation of a regionally and seasonally stratified macroinvertebrate index for West Virginia wadeable streams. Environ Mon Assess 185: 1515-1540. Replicate samples must be collected and made available to EPA upon request.
- Conduct rapid bioassessment consistent with WV DEP. 2015. Watershed Assessment Branch 2015 Field Sampling Standard Operating Procedures. Division of Water and Waste Management. Watershed Assessment Branch, Charleston, WV. Available at: https://dep.wv.gov/WWE/watershed/wqmonitoring/Documents/SOP%20Doc/2015WABSOP/2015%20WAB%20Field%20Sampling%20SOP.pdf
- Defendants must photograph all features upon which scoring is based and include all photographs with each monitoring report.
- Restoration consistent with the objectives of the Consent Decree is not achieved until the following quantitative performance metrics have been achieved:
  - The stream habitat assessment scores (RBP) for the reaches of Turkey Creek where work has been performed are consistent with "optimal" conditions (160 – 200).
  - The coverage of invasive species within the buffer width provided on the SWVM forms will be more than five percent (5%) within the restored reach.
  - Turkey Creek will be monitored at five permanent, representative locations where work has been done to document that the physical processes that occur in the stream are functioning within acceptable limits i.e. width to depth ratio (10-14), entrenchment ratio (1.4-2.2), and sinuosity (1.1-1.4).
  - All in-stream stream structures placed during the restoration and monitoring period should be monitored for evidence of failure (i.e. erosion, undercutting, etc.) and corrected prior to release from monitoring.
  - Macroinvertebrates must not significantly degrade in quality as measured by GLIMPSS season and region. Based on 68 samples for Mountain Spring and 52 samples for Mountain Summer, a decrease in GLIMPSS score for the Spring sampled sites of more than 14.2 points indicates degradation. For Summer sampled sites, a decrease of more than 13.5 points indicates degradation. Macroinvertebrate scores should not depart downward from the baseline scores at the sample location at the closest riffle in Turkey Creek upstream of all the dams by more than 14.2 points in the Spring and 13.5 points in the Summer.

## Pre-existing fords and crossings

- Defendants must provide documentation to support any assertion that a ford or crossing pre-existed construction of the dam structures.
- Fords documented as pre-existing the work at issue may remain in place and be used as access points provided their use as access points does not increase impacts.

5

## Compensation for Impacts to Streams and Wetlands Using the West Virginia Stream and Wetland Valuation Metric (WVSWVM) to Determine the Appropriate Amount of Mitigation Needed to Offset Permanent and Temporal Losses to Aquatic Resources

- Calculation of amount of compensation necessary to offset permanent and temporal losses to aquatic resources
    - Debits and credits of the on-site work can be calculated using WVSWVM, version 2.1
    - The pre-impact existing condition of Turkey Creek should have an "optimal" RBP score and a "very good" WVSCI for the debit calculation.
    - Temporal Loss- Construction should be assessed a value of "7" for the number of years between impact and restoration work.
    - Temporal Loss- Maturity should be assessed a value of "10" for the number of years anticipated for successful restoration.
    - Perpetual protection (a value of "101") can be used due to the expectation of a deed restriction.
    - Buffer width can be included up to 150 feet per bank for the width that is anticipated to be preserved under the deed restriction
    - Restoration level incentives (under "Extent of Stream Restoration") are not applicable to enforcement actions.
- Implementation of compensation to offset permanent and temporal losses to aquatic resources
    - Compensation may be provided through purchase of stream credits in a mitigation bank whose primary or secondary service area includes Turkey Creek or through Defendants-responsible mitigation in the form of on-site stream enhancement or off-site stream restoration or enhancement within the Indian Creek or Upper New River watersheds, subject to EPA approval
- To the extent Defendants believe that the proposed compensation will result in more credits than those necessary to offset permanent and temporal losses to aquatic resources, document the surplus credits and how Defendants arrived at that calculation

# Exhibit 2

Declaration of Katelyn Almeter



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

Mr. John Sams
HC 71 Box 74A
Asbury, West Virginia 24916

AUG 1 3 2018

Re: Turkey Creek
Site Visit: July 31, 2018
Civil Action 1:15-cv-16018

Dear Mr. Sams:

The U.S. Environmental Protection Agency (EPA) appreciates having the opportunity on July 31, 2018, to conduct a site visit to the Turkey Creek Site (Site) to observe the status of dam removal. EPA was accompanied by a representative of the U.S. Army Corps of Engineers, Huntington District. On July 31, 2018, 18 of the 20 dams had been removed from the stream channel of Turkey Creek. The dams were generally broken up into two or three large pieces and pulled from the channel. Along the stream bank locations where the dams had been removed a seed mix and hay had been placed for stabilization. Some but not all of the reseeded locations had started to germinate. Coverage was generally sparse but seeding had been recent due to the active work going on. In order to ensure full compliance with the above-referenced Consent Decree, please provide the following:

- Please provide photos documenting the removal of the remaining two dam structures and documenting your representation during your telephone conversation with Katelyn Almeter on August 8, 2018 that the subsequent rain event has provided sufficient flow to address accumulation of large sediment in the middle of the channel. Please submit a photo at each of the previous dam locations.

- Please confirm that the remaining pieces of the dam structures are not located within the Turkey Creek floodplain. As a general matter, please that the remaining pieces of the dam structures have been placed at least 10 feet from the stream bank.

- As discussed on-site, please ensure that the native seed mix used to stabilize areas that were disturbed is applied at a rate sufficient to provide 80% vegetative coverage on the disturbed areas.

*Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.*
*Customer Service Hotline: 1-800-438-2474*

- Per Paragraph 23 of the above-referenced Consent Decree, please provide the details on the monitoring plan for the Site. Such monitoring plan must include the elements detailed in the attachment to EPA's March 12, 2018 letter approving upon specified conditions the restoration plan.

- As discussed on-site, EPA agrees to reevaluating the status of the stream bank erosion areas, located at points of dam failures, and stream flow alteration in connection with the Spring 2019 evaluation discussed in the attachment to EPA's March 12, 2018 letter. At that time, EPA will determine if corrective measures are necessary or the stream has self-stabilized. Please notify EPA when the evaluation is planned.

We appreciate your cooperation as we move forward. Should you have any questions, please feel free to contact me at 215-814-2099 or at Lutte.Todd@epa.gov.

Sincerely,

Todd Lutte
Office of Environmental Programs

cc: Michael Callaghan, Esq. – Neely & Callaghan

# Exhibit 3

Declaration of Katelyn Almeter



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION III
1650 Arch Street
Philadelphia, Pennsylvania 19103-2029**

Mr. John Sams
HC 71 Box 74A
Asbury, West Virginia 24916

OCT 18 2018

Re: Turkey Creek
Site Visit: August 28, 2018
Civil Action 1:15-cv-16018

Dear Mr. Sams:

The U.S. Environmental Protection Agency Region III (EPA) appreciates having the opportunity on August 28, 2018, to conduct a site visit to the Turkey Creek Site (Site) to observe the status of dam removal. On our previous site visit of July 31, 2018, EPA noted that 18 of the 20 dams had been removed from the stream channel of Turkey Creek. Through correspondence dated August 13, 2018, and subsequent phone conversations with Katelyn Almeter, EPA requested the last two dams be removed from the channel and floodplain and stabilized along with some additional requests for monitoring. All 20 dams that were subject to the Consent Decree have been removed from the channel and floodplain and stabilization measures completed. Consistent with the above referenced Consent Decree, please provide the following:

- Per Paragraph 23 of the above-referenced Consent Decree and EPA's letter and attachment dated March 12, 2018, please provide the details on the monitoring plan for the Site.

- As discussed on-site, EPA agrees with the proposal to reevaluate the status of the stream bank erosion areas, located at points of dam failures, and stream flow alteration in the Spring of 2019 to determine if corrective measures are necessary or the stream has self-stabilized.

- As discussed in our March 12, 2018 letter and previous correspondence, to satisfy Paragraph 29 of the Consent Decree please record a deed restriction on the relevant portions of the property.

*Printed on 100% recycled/recyclable paper with 100% post-consumer fiber and process chlorine free.
Customer Service Hotline: 1-800-438-2474*

Comments herein are intended to assist with efforts to achieve compliance. We appreciate your cooperation as we move forward. Should you have any questions, please feel free to contact me at 215-814-2099 or at Lutte.Todd@epa.gov.

Sincerely,

Todd Lutte
Office of Environmental Programs

cc: Michael Callaghan, Esq. – Neely & Callaghan
Austin Saylor, Esq., U.S. Department of Justice
Susan Porter – U.S. Army Corps of Engineers, Huntington District